William L. STOKES, Conservator of the Person and Estate of Mary Patricia Hall, Plaintiff-Appellant,

v.

Richard LEUNG, M.D., Defendant-Appellee.

Court of Appeals of Tennessee, Western Section, at Jackson.

Dec. 1, 1982.

Rehearing Denied Jan. 10, 1983.

Application for Permission to Appeal Denied by Supreme Court May 2, 1983.

On Petition for Rehearing Jan. 10, 1983.

James S. Cox, Memphis, for plaintiff-appellant.

John J. Thomason, Memphis, for defendant-appellee.

Frank J. Scanlon, Sr. Asst. Atty. Gen., Nashville, for State.

NEARN, Presiding Judge, Western Section.

This is a medical malpractice case for injuries sustained by the plaintiff when she jumped from the window of her hospital

room. Originally, Doctor's Hospital in Memphis was named as a defendant along with Dr. Leung, but on the morning of trial plaintiff voluntarily non-suited the hospital. At the close of plaintiff's proof against the doctor, the Trial Judge directed a verdict for the defendant, Dr. Leung. The plaintiff appeals that action of the Trial Judge and the defendant also raises issues on appeal in the event the action of the Trial Judge is not sustained by this Court.

■ An orderly opinion requires that before considering the matter of the directed verdict we first consider an issue raised by the defendant-appellee. The testimony of plaintiff's only expert medical witness was objected to by defendant, but such objection was overruled and the testimony admitted. Plaintiff's case therefore hinges on the correctness of that ruling since in medical malpractice cases, negligence and causation are ordinarily required to be proved by expert medical testimony. T.C.A. § 29–26–115(b). See *German vs. Nichopoulos,* (1978 Tenn.App.W.S.) 577 S.W.2d 197.

■ Plaintiff offered the expert testimony of Dr. Benjamin Bursten, a non treating doctor who specialized in psychiatry. The defendant is a doctor who specializes in the field of internal medicine and cardiology. The objection was that Dr. Bursten was not qualified to give an opinion with respect to the standard of care and the departure therefrom in the medical field of the defendant. During the *voir dire* of Dr. Bursten he was questioned and answered as follows:

Q. If Dr. Leung is Board certified in internal medicine and cardiology, you are not in the same field, are you?

A. We are in the same broad field—that is, medicine and surgery. Of course, we hold the same license, but he has a different specialty from mine.

Q. But you are familiar with the standards of practice of psychiatry, is that correct?

A. I am familiar with really two things—the standards of practice in psychiatry and the standards of practice with regard to psychiatric patients

in general medicine. This is essentially my job at U.T. is to teach the latter.

\* \* \* \* \* \*

(continuing)

Q. (Mr. Cox)—Dr. Bursten, are you familiar with the standards of care and skill expected and required of a man who is an internal medicine man and cardiologist who is undertaking the care and treatment of a patient who has a psychiatric disorder and who is specifically suffering from a mental disorder? Are you familiar with those standards?

A. I teach that at the University.

THE COURT: Let me ask you this, Doctor: Is a cardiologist or internal medicine specialist held to the same degree of care as a psychiatrist in this field.

THE WITNESS: If he is going to treat a psychiatric condition, Your Honor, he is held to a minimal degree.

THE COURT: Do you know what that minimal degree is?

THE WITNESS: Yes I do.

■ In view of that testimony it appears to this Court that the objection must go more to the weight of the evidence rather than its admissibility. In addition, it is the law of this state that the Trial Judge has wide discretion in the matter of the qualifications of expert witnesses. See *McCay vs. Mitchell,* (1970 W.S.) 62 Tenn.App. 424, 463 S.W.2d 710. We see no error in the exercise of that discretion in this case. Appellee's issue is without merit.

Now, having determined that the testimony was properly before the Court, we must ascertain whether such testimony and the evidence as a whole, considered at the time the motion for directed verdict was made, present any material facts upon which liability of the defendant could lawfully be predicated. In making this determination we must examine all the evidence presented on the issue, take the strongest legitimate view of the proof in favor of the complaining party, discard all countervailing evidence, resolve all disputes as to any

material evidence or doubt as to conclusions to be drawn from the evidence all in favor of the complaining party. *St. Martin vs. Doty,* (1972 Tenn.App.W.S.) 493 S.W.2d 95; *Poole vs. First National Bank of Smyrna,* (1946 M.S.) 29 Tenn.App. 327, 196 S.W.2d 563.

Viewing the proof in the manner required, it shows that Mary Hall was brought to the Doctor's Hospital in Memphis in the late afternoon of February 25, 1977. She was first seen in the emergency room by a Dr. Dunn who noted that the patient appeared to be suffering from "acute depression" and ordered numerous tests and instructed that suicide precautions be instituted by the hospital. Also, the medical records contain these notations regarding the patient made by the admitting physician:

Has been unusually tired and cloudy in her thinking over past few days; Jimmy Carter, President of U.S.A., told her to come to the hospital to see what's wrong. Has been depressed since the age of thirteen. Has heard voices and had visual hallucinations over past few days. She believes people are out to get her and some threatened her. Has been taking Elavil for depression.

Alert. Oriented only to person. Cranial nerves 2–12 intact. Cerebellum normal limits. Sens normal limits. Motor normal limits. Mental status: inappropriate affect, thought processes underproductive. Hears voices, visual hallucinations, paranoid with people.

The patient was removed to the second floor of the hospital and assigned to Dr. Leung, the defendant. Dr. Leung was called to testify by the plaintiff. He testified as to his initial impression as contained in the hospital records which were:

Twenty year old white female. Mentally slightly confused, alleges that running, fell down and hit her head and had some bruises on leg. L.M.D.____? President of U.S.A. called her to go to the hospital, therefore he was worried about her. Relates been taking Hydrodiurill two a day

and Elavil____not taken since four days ago.____Depression neurosis, hypertension.

Dr. Leung then started Mrs. Hall on a drug similar to the one she said she had been taking and ordered that she be seen by Dr. Rutschman, a psychiatrist.[1] Dr. Leung again saw plaintiff the next morning, testified that at that time the patient complained to him that noises in the hall were very disturbing to her. Then, the following notation was placed on the chart by Dr. Leung: "Keep quiet for her in room; close door all the time. Leave intercom open to detect noise in room; suicide precaution; start Sinequan 25 p.o. then q.i.d."

At 2:10 p.m. on the afternoon of February 26, plaintiff, Mary Hall, jumped out of the window in her room and severely injured herself.

During the period between plaintiff's arrival on the second floor and her leap on the 26th, the nurses' records reveal that Ms. Hall cried and heard voices talking to her all evening on February 25. At one point Ms. Hall dumped a pitcher of water over her head "so God will cleanse her of her sins." The hallucinations went on all night and Ms. Hall feared someone was going to shoot her. On February 26th Ms. Hall was found crying and "waiting for the president" to come see her. Her condition improved around noon and she even came to the nurses station to discuss a career as a lab technician. However, at 2:00 p.m. Ms. Hall locked herself in her bathroom and when the nurses eventually opened the bathroom door, Ms. Hall was crying in the floor and told the nurses she was afraid.

In an effort to establish a causal connection between the acts of the defendant and the injuries suffered by the plaintiff, Dr. Bursten testified for the plaintiff in part as follows:

Q. Do you have an opinion as to what was the direct, proximate cause of Mary Patricia Hall jumping from the window at the Doctors Hospital on February 27, 1977?

---

1. Dr. Rutschman was unable to see her before she leaped out the window.

A. Yes.

Q. Tell the Court and jury what your opinion is.

A. I think there were three proximate causes. Physically she was an acutely disturbed psychotic person with all of the fears that people are going to harm her, and she didn't know where to turn.

Secondly, she was given an incorrect medication, and was not given a correct medication to calm the fears.

Thirdly, she was put in an insecure room out of the sight of the people who might have prevented her from doing what she did.

MR. COX: You may cross-examine.

■ There can be more than one proximate cause of an injury. *Whitehurst vs. Howell,* (1936 M.S.) 20 Tenn.App. 314, 98 S.W.2d 1071. Liability of a defendant may be established if the defendant's act or failure to act is a proximate cause. *Payne vs. Woodward,* (1949) 190 Tenn. 32, 227 S.W.2d 47. Therefore, if the plaintiff's proof tends to show the defendant responsible for any one or more of the three alleged proximate causes an issue for jury determination was presented.

It is not and could not be contended that the defendant was responsible for plaintiff's psychotic condition. Therefore, we are left with the defendant's orders regarding medication and his orders regarding closing the door to plaintiff's hospital room and leaving the intercom system open as possible proximate causes chargeable to defendant's conduct. We will first consider the matter of the door and the intercom.

■ We hold that when a hospital elects to accept a patient with psychiatric disorders and with orders that "suicide precautions" be taken, the prime responsibility to afford reasonably safe facilities and reasonable attendance to the patient's needs to prevent self injury lies with the hospital and not the physician. The physician is not in constant attendance. The hospital is supposed to be. If a doctor prescribes certain medication and the hospital nurse administers another, is the doctor liable for that error? We know of no case in this state that so holds. What we have said on this point is, as we see it, nothing more than a restatement of the rule enunciated in *O'Quin vs. Baptist Memorial Hospital,* (1947 Tenn.) 184 Tenn. 570, 201 S.W.2d 694, and reiterated in *Spivey vs. St. Thomas Hospital,* (1947 M.S.) 31 Tenn.App. 12, 211 S.W.2d 450, that:

> The general rule is that a hospital is required to exercise such reasonable care toward a patient as his known condition may require and the extent and character of this care depends upon the circumstances of each case.

■ However, such rule of law does not exonerate a physician who might countermand such reasonable care actions of the hospital if such countermand is a proximate cause of an injury. Therefore, we must further examine the record to determine if such is the case in this instance. Plaintiff's expert testimony was to the effect that when a hospital is advised that "suicide precautions" are to be taken its duty is to place the patient in a padded, secure room in which there are no instruments of self injury and the patient is to be observed at approximately 15 minute intervals. If such facilities are not available, the patient is to be in constant attendance and observation by hospital personnel. In this case, the proof is that the hospital did neither. There was no padded, secure room available and the hospital did not afford constant attendance. What was done was to place the patient in an ordinary room near the nurses station and the nurses or attendants visually checked on her about every 15 minutes. Therefore, by the expert's testimony, the hospital failed in its duty. Of course, as stated at the onset, the hospital is not now a defendant in the case, but these facts must be brought out to show that the defendant did not countermand any reasonably required (under the proof) procedures of the hospital. However, the defendant did order changed the negligent (under the proof) procedures of the hospital. This being true, it must now be ascertained, if, under the proof, such order by the defendant can be said in law, to be a proximate

cause of plaintiff's injuries. We hold it may not be so considered.

The proof shows that the interior of the patient's room could not be observed from the nurses station. Therefore, under the procedures instituted by the hospital, in order to prevent self injury to a patient, an attempted self injury must be about to take place when a hospital attendant looks in at the regular intervals; the patient calls on the intercom and so advises the nurses; a commotion in the patient's room loud enough to be heard without intercom is heard by someone or a passerby happens to be walking by, and looks into the room, notices something amiss and takes independent action to prevent injury or timely advises the nurses station.

■ The defendant ordered the intercom be kept open at all times. This cannot but be said to be an improvement over the existing conditions. He also ordered the door to be kept closed to lessen patient agitation. This might be considered a deleterious act but for the fact that the room could not be visually observed from the nurses station. However, it did prevent someone who if passing by from looking in if they chose to and observing the plaintiff's stressful condition and reporting same to the nurses, or perhaps independently thwarting a suicide attempt if such had been occurring at that time. We are of the opinion that such proof attempts to establish the negligence of the defendant based upon too many "ifs"; and liability, if found, would be the result of sheer speculation and possibility—not probability. A verdict which must be based on speculation and conjecture is impermissible in law. *St. Martin vs. Doty, supra; Ray Carter, Inc. vs. Edwards,* (1969 Tenn.) 222 Tenn. 465, 436 S.W.2d 864; *Williams vs. M.C. West Construction Company,* (1978 Tenn.App.M.S.) 579 S.W.2d 883.

■ This leaves as a possible proximate cause the issue of the medication prescribed or failed to be prescribed by the defendant. Counsel for appellee argues that such action of the doctor cannot be a predicate for liability because plaintiff's expert testified that the administration of Sinequan to the plaintiff "will have no effect because it's the wrong drug or it either will have no effect because it is the wrong drug or it will make matters worse, plus it will make them more energetic and more aggravated." In short, the administered drug might or might not have affected matters.

If this were all the proof on the subject, we would be inclined to agree with counsel for defendant; because, such proof again embarks on the sea of conjecture in a ship propelled by the winds of speculation. However, there is more. The plaintiff's expert also testified:

And, of course, in giving the wrong drug, he also then failed to give the right drug which would be a calming kind of drug, often called major tranquilizer, a drug which would help get rid of the false beliefs, the delusions, the voices and so on.

He didn't give the drug which would be necessary to calm her down.

So this is the first area where he differed from the usual standards of practice.

Insofar as the administration of Sinequan is concerned, the proof is that it might as well have been a glass of water. There is no proof that it hurt and no proof it helped—only conjecture. But, plaintiff's expert testified that the failure to prescribe the proper medication deviated from the usual standards of practice required of physicians with similar qualifications. Additionally, the failure to prescribe the proper drug was testified to be a proximate cause of plaintiff's injuries by plaintiff's expert. Therefore, whether or not such was actually a proximate cause was a matter for jury determination. We see nothing speculative about that testimony or that it possessed any other legal impediment which would bar a jury resolution of the question presented. On this point we conclude that the plaintiff is entitled to a jury trial and the Trial Judge erred in granting the motion for directed verdict in its entirety.

■ Since the case must be remanded for a new trial, we will address alleged eviden-

tiary errors raised by appellant. Counsel cites as error the refusal of the Trial Judge to allow plaintiff to place in evidence, as part of plaintiff's proof in chief, the depositions of Dr. J. Lee Rutschman. The *defendant* had taken the deposition of Dr. Rutschman and listed Dr. Rutschman as one of the *defendant's* expert witnesses.

Rule 32.01, Tennessee Rules of Civil Procedure, sets forth that, at trial, any party may use any part of or all of any deposition under certain conditions or provisions. Counsel for appellant insists that he had the right to use the deposition in his proof in chief by virtue of Tennessee Rules of Civil Procedure 32.01(3)(D) which provides for such use when "the party offering the deposition has been unable to procure the attendance of the witness by subpoena."

Counsel for appellee rebuts that argument with the fact that the record does not reveal that counsel for appellant ever issued a subpoena for Dr. Rutschman. As surrebuttal, counsel for appellant relies upon T.C.A. § 24–9–105(a)[2] which grants to practicing physicians an exemption from the penalties for non attendance.

On its face, T.C.A. § 24–9–105(a) does not grant an exemption from subpoena. The code section states that the exemption granted must be claimed "at the time the subpoena is served." The exemption granted is from "penalties" not from a subpoena. In order to determine whether the doctor is amenable to court attendance, the subpoena must be served and the witness must then make his election regarding attendance. We may not presume that election. Therefore, there has been no showing that plaintiff was unable to procure the attendance of the witness by subpoena. Accordingly, the Trial Judge did not err in refusing to admit the deposition offered by the plaintiff. The issue is without merit.

■■ Also, counsel for plaintiff faults the Trial Judge in permitting defense counsel to cross-examine plaintiff's expert witness by use of certain medical literature. Counsel for defendant cross-examined the plaintiff's expert witnesses with the use of *Physician's Desk Reference.* This book was not listed in an interrogatory of the plaintiff requesting the defendant to furnish:

> [t]he names of journals, titles of publications, publishers or other methods of identification of all treaties, articles, pamphlets, books and other publications used or expected to be used in this cause of action in the Trial of this litigation.

Counsel for appellant claims that defendant's failure to furnish him this information deprived him of the "benefit of use of discovery" at the trial level. Admittedly, Tennessee Rules of Civil Procedure 26.02(1) states

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.

However, if the rule is to be construed to require a party to list the literature expected to be used on cross-examination, it will also require the party seeking such information, at the same time the request is made, to furnish a properly functioning crystal ball to the other party or at least to divulge all questions that will be asked of the witness on direct examination as well as the answers that will be forthcoming; and, be bound not to deviate therefrom. Otherwise, there is simply no way one can know what will be expected to be asked on cross-examination or of what form that cross-examination will consist, or if there will be any cross-examination at all. Whether or not to cross-examine or its form is a decision often times made at the last moment. In addition, cross-examination, when artfully done, has one admirable tendency—to bring out the truth. To require counsel to

**2.** 24–9–105. Official or occupational exemption from subpoena.—(a) The witness, if he occupies any of the positions, or is employed in any of the capacities enumerated in subdivision (7) of § 24–9–101, is exempt from the penalties provided for the nonattendance of witnesses summoned by subpoena, provided he claim such exemption at the time the subpoena is served, stating the ground thereof, in which case the officer will return the facts according to the claim.

divulge cross-examination before the witness has testified is impossible. Even if it were not, such requirement would destroy its effectiveness.

We do not so construe the rule and hold the Trial Judge did not err in his action.

The issue is without merit.

Prior to trial, ruling in limine, the Trial Judge held that the findings of the Medical Malpractice Review Board were inadmissible as evidence. The evidence was attacked on the basis of the alleged unconstitutionality of the act and the Attorney General has taken part in this appeal. Counsel for defendant cites this action of the Trial Judge as reversible error. All the briefs filed in this case devote much space to the constitutional issue.

■ Of course, the ruling of the Trial Judge on this issue had absolutely nothing to do with the initial outcome of this case as the Trial Judge directed a verdict for defendant before the defendant was obligated to put on any proof. It was the defendant who desired to admit the report of the board in his proof which he was never called upon to adduce. However, that fact standing alone would, in our opinion, be insufficient reason not to address the issue (in light of the fact that we must remand) if the constitutional issue had been necessarily and properly before the Trial Judge. The general rule of constitutional issues is that such should not be addressed by any Court unless necessary for determination of the problem presented. *Watts vs. Memphis Transit Management Company,* (1971) 224 Tenn. 721, 462 S.W.2d 495.

■ We find that the Trial Judge was absolutely correct in his refusal to admit the evidence profferred on grounds other than constitutional. The constitutional ground as an exclusionary reason should not have been considered below and we do not consider it on appeal.

Counsel for the appellee tendered as proof that which in the record is described as Exhibit 1. That exhibit consists of three parts: the first describing the standard of care to be applied; the second stating the allegations made by the plaintiff; and third stating the board's findings in detail and its conclusion. This exhibit appears to be an attempt to meet the criteria of admissible evidence as set forth in T.C.A. § 23–3409 (1979 Supplement) which states:

> The formal statement of the board and the minority statement, if any, shall be admissible at a subsequent trial as an exception to the hearsay rule. The formal statement of recommendations of the board or the minority statement shall include, but not be limited to, (1) the standard of conduct applied; (2) the alleged deviation from such standard; and (3) findings and conclusions.

In 1980, the legislature altered the Act to modify the contents of the "formal statement" to consist of only one or more of the following:

T.C.A. § 29–26–112(c)

The board shall prepare a formal statement of its recommendations. If a minority of the board members do not agree with the statement and recommendations of the majority, a minority statement may be prepared which shall be identified as such. The formal statement of recommendations of the board or the minority statement shall consist of one or more of the following statements:

(1) The evidence supports the conclusion that defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint;

(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint;

(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury; or

(4) The conduct complained of was or was not a factor in the resultant damages. If so, whether the plaintiff suffered any disability and the extent and duration of the disability, and any permanent impairment.

As may now be seen, the formal statement (1979 Supplement) which was proffered in this case consists of far more than that permitted by the 1980 Act. The Act, § 29–26–112 allows only the formal statement to be introduced into evidence. In the case of *Baldwin vs. Knight,* (1978 Tenn.) 569 S.W.2d 450, our Supreme Court unequivocally held that nothing "beyond the language of the formal statement, is admissible at trial." The constitutional issue aside, we hold that only the formal statement as defined by the Legislature under law as it exists at the time of trial, could be admitted. Further, that the admission of a hearsay statement of the Medical Malpractice Review Board is a procedural remedy only. If any "vested right" is given to a party under the 1979 version or 1980 version of the statute, such right would be to have admitted into trial only that evidence which was defined by statute at the time of trial. This case was tried in November 1981. The evidence proffered in this case under the 1979 Act does not meet the statutory requirement existant at time of trial. Our holding in this regard does not act as a constitutionality prohibited retrospective application of laws as set forth in Article 1, Section 20, of the Constitution of the State of Tennessee.[3] In *Brewer vs. Aetna Life Insurance Company,* (1973 Tenn.) 490 S.W.3d 506, our Supreme Court in holding that remedial procedural legislation (if otherwise constitutional) did not violate constitutional rights, quoted from *Marx vs. Hanthorn,* (1893) 148 U.S. 172, 13 S.Ct. 508, 37 L.Ed. 410, as follows:

It must be evident that the right to have one's controversies determined by existing rules of evidence is not a vested right. These rules pertain to the remedies which the state provides for its citizens, and, generally in legal contemplation, they neither enter into and constitute a part of any contract, nor can they be regarded as being of the essence of any right which a party may seek to enforce. Like other rules affecting the remedy, they must, therefore, at all times be subject to modification and control by the legislature; and the changes which are enacted may lawfully be made applicable to existing causes of action, even in those states in which retrospective laws are forbidden.

\* \* \* \* \* \*

Courts of high authority have held that mere rules of evidence do not form part of contracts entered into while they are in force, and that it is competent for the legislature to, from time to time, change the rules of evidence, *and to make such change applicable to existing causes of action.*" (emphasis ours)

The Trial Court did not err in failing to admit the evidence proffered as the formal statement of the review board.

Appellee's issues are found without merit. Appellant's issues are also found without merit except for the matter of the directed verdict and then only as to the issue of the alleged negligent failure to administer the proper drug.

The result is that the judgment of the Trial Court is reversed and the cause is remanded for a new trial on the issue indicated.

Costs are adjudged against appellee.

Done at Jackson in the two hundred and seventh year of our Independence and in the one hundred and eighty-seventh year of our Statehood.

HIGHERS, J., and MATHERNE, Special Judge, concur.

## ON PETITION FOR REHEARING

A courteous petition to rehear has been filed by counsel for plaintiff. First, it is insisted a jury question exists as to whether the action of the defendant in countermanding certain of the hospital's instructions constituted a proximate cause of plaintiff's injuries. We held no jury question existed on that issue and adhere to that

---

**3.** Article I, Section 20. No retrospective laws.
—That no retrospective law, or law impairing the obligation of contracts, shall be made.

holding. Second, it is suggested that on remand the plaintiff should be able to again proceed against the defendant upon all theories of liability and not be limited as required by our opinion. This seems a rather novel suggestion to us and to acquiesce in it would place this Court and the Trial Court in a most peculiar posture. This case was never submitted to a jury. The matter was determined by the Trial Judge as a matter of law after plaintiff's proof was presented. We have held that, in part, the Trial Judge was correct as a matter of law in dismissing any claim based on some of the theories of the plaintiff. On those issues which we have determined the Trial Judge acted correctly in dismissing, the plaintiff wants a retrial. We know of no law or logic that would support our instruction to the Trial Judge to retry the issues in which he committed no error in dismissing and which action we affirmed.

Accordingly, the Petition to Rehear is denied.